The STATE of Texas, Appellant,

v.

Mario Alberto FLORES, Appellee.

No. 13–96–271–CR.

Court of Appeals of Texas, Corpus Christi.

June 26, 1997.

---

Ernesto Gonzales, Harlingen, for Appellee.

John A. Olson, Asst. County & District Attorney, Luis V. Saenz, Yolanda De Leon, District Attorney, Brownsville, for State.

Before DORSEY, FEDERICO G. HINOJOSA, Jr. and CHAVEZ, JJ.

## OPINION

CHAVEZ, Justice.

The State appeals from the trial court's order dismissing charges against appellee Mario Alberto Flores for failure to afford him a speedy trial. Flores was arrested on December 21, 1991 for involuntary manslaughter.[1] He was released on a $20,000 bond shortly after his arrest. Flores was not indicted until December 13, 1995. Flores moved to dismiss for failure to afford a speedy trial on January 5, 1996. A hearing on the motion was held on March 28, 1996, and the motion was granted on May 5, 1996. In a single point of error, the State argues that the trial court abused its discretion in ordering the case dismissed. We affirm the judgment of the trial court.

Criminal defendants are entitled to a speedy trial under both federal and state constitutions. *See* U.S. CONST. amend. VI; TEX. CONST. art. I, § 10. The following balancing test, weighing the conduct of the

prosecution and the accused, has been developed by the United States Supreme Court to determine whether an accused has been denied a speedy trial:

1) the length of the delay,

2) the reason for the delay,

3) the defendant's assertion of his speedy trial right, and

4) prejudice to the defendant from the delay.

*Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972).

Although the constitutional speedy trial rights of Texas and the United States are independent, Texas courts look to the federal courts in determining state constitutional rights. *Harris v. State,* 827 S.W.2d 949, 956 (Tex.Crim.App.), *cert. denied,* 506 U.S. 942, 113 S.Ct. 381, 121 L.Ed.2d 292 (1992); *State v. Empak, Inc.,* 889 S.W.2d 618, 621 (Tex.App.—Houston [14th Dist.] 1994, pet. ref'd). Texas uses the *Barker* test to determine whether a defendant has been denied his state speedy trial right. *Harris,* 827 S.W.2d at 956; *Clarke v. State,* 928 S.W.2d 709, 713 (Tex.App.—Fort Worth 1996, pet. ref'd).

The primary burden for assuring that cases are promptly brought to trial lies with prosecutors and the courts. *Barker,* 407 U.S. at 530, 92 S.Ct. at 2192. The defendant has the burden of first showing that sufficient delay has occurred to require application of the *Barker* balancing test. *Ramirez v. State,* 897 S.W.2d 428, 431 (Tex. App.—El Paso 1995, no pet.); *State v. Hernandez,* 830 S.W.2d 631, 635 (Tex.App.—San Antonio 1992, no pet.). Upon such a showing, the burden shifts to the State to justify the delay, and the defendant then has the burden of showing his diligent assertion of the right to a speedy trial and prejudice resulting from the delay. *Id.*

### Standard of Review

A review of speedy trial cases in Texas indicates some confusion regarding the

---

1. See Act of June 14, 1973, 63rd Leg., R.S. ch. 399 § 19.04.1973 TEX. GEN. LAWS 913, amended by Act of June 19, 1993, 73rd Leg., R.S. ch. 900, § 1.01, 1993 TEX. GEN LAWS 3586, 3614, 3697 (current version at TEX. PENAL CODE ANN. § 49.08 (Vernon 1994)).

proper standard of review. Some courts have indicated willingness to reverse only if the trial court has abused its discretion,[2] while others describe their review as *de novo*.[3] For the reasons expressed below, we conclude that the proper method of review is to separate the speedy trial issue into a factual component and a legal component, and apply an abuse of discretion standard of review to the factual component while reviewing the legal component *de novo*.

■ The speedy trial issue presents a mixed question of law and fact. *Clarke v. State*, 928 S.W.2d 709, 724 (Tex.App.—Texarkana 1996, pet ref'd) (Livingston, J., concurring). The United States Supreme Court has frequently discussed the components of mixed questions and the appropriate standard of review in cases concerning the constitutional rights of criminal defendants. "Factual issues" means "basic, primary, or historical facts: facts in the sense of a recital of external events and the credibility of their narrators." *Thompson v. Keohane*, 516 U.S. 99, ——, 116 S.Ct. 457, 464, 133 L.Ed.2d 383 (1995) (quoting *Townsend v. Sain*, 372 U.S. 293, 310 n. 6, 83 S.Ct. 745, 756 n. 6, 9 L.Ed.2d 770 (1963)). Some issues go beyond the scope of "basic, primary, or historical facts," but nevertheless are considered "fact" issues because the trial court is better positioned to decide these issues. *Thompson* at ——, 116 S.Ct. at 465. Examples include jury bias and competency to stand trial, which depend heavily on the trial court's evaluation of the demeanor and credibility of the individuals in the trial courtroom. *Id.*

■ Other issues are mixed issues, which contain a factual element and a legal element. For example, under the area of law emerging from *Miranda v. Arizona*[4] and dealing with custodial interrogations, determining whether a suspect is "in custody" requires two discrete inquiries: 1) what were the circumstances surrounding the interrogation, and 2) given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. *Id.* Federal courts review the state trial court's findings of fact regarding the circumstances surrounding the interrogation in a deferential manner, presuming them to be correct. 28 U.S.C.A. § 2254(d) (West 1992). After the facts have been established, the second inquiry calls for application of the controlling legal standard to the historical facts. *Id.*

The speedy trial analysis is analogous to the two stage analysis above. First, the circumstances surrounding the bringing of the case to trial must be established (*i.e.*, when was the defendant arrested or charged, when tried, what is the State's excuse for the delay, what did the defendant do to try to assert his right, have witnesses or evidence been lost, has the defendant suffered emotionally from the wait ... ). After these facts have been established, then the legal standard of *Barker* must be applied to these historical facts.

The *Thompson* court held that "once the historical facts are resolved" *de novo* review of the application of the legal principle to those facts was appropriate. *Thompson*, 516 U.S. at ——-——, 116 S.Ct. at 465-67. *Thompson* does not expressly say what sort of review, if any, is appropriate for the "historical facts" component. However, under section 2254(d)(8), "pertinent to a review of the sufficiency of the evidence," the federal appellate court does not apply the presumption favoring a state trial court's fact finding when "such factual determination is not fairly supported by the record." 28 U.S.C.A. § 2254(d)(8) (West 1992). We consider section 2254(d)'s limited presumption to be roughly analogous to the deference Texas

**2.** Cases applying an abuse of discretion standard include: *State v. Empak, Inc.*, 889 S.W.2d 618, 623 (Tex.App.—Houston [14th Dist.] 1994, pet. ref'd); *State v. DeBlanc*, 858 S.W.2d 19, 21–22 (Tex.App.—Beaumont 1993, no pet.); *State v. Hernandez*, 830 S.W.2d 631, 634 (Tex.App.—San Antonio 1992, no pet.); *State v. Owens*, 778 S.W.2d 135, 138 (Tex.App.—Houston [1st Dist.] 1989, pet. ref'd).

**3.** Cases applying a *de novo* review include: *Holmes v. State*, 938 S.W.2d 488, 490 (Tex.App.—Texarkana 1996, no pet.); *Clarke v. State*, 928 S.W.2d 709, 713 (Tex.App.—Fort Worth 1996, pet. ref'd).

**4.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

appellate courts show to the decisions on factual issues by Texas trial courts.

The Court of Criminal Appeals recognized the distinction between the factual component and legal component presented by many of the constitutional rights of criminal defendants in *Higbie v. State*, 780 S.W.2d 228 (Tex.Crim.App.1989).[5]  In *Higbie*, the police had set up a roadblock at a time and location specifically designed to catch drunk drivers. The roadblock was challenged as an unreasonable search under the fourth amendment. U.S. CONST. amend. IV. The court said that the "probable cause analysis" used in Fourth Amendment cases first entails a review of the facts, and then those facts are applied to the law of search and seizure.[6]  *Higbie* at 231.

The recent opinions applying only *de novo* review rely on *Emery v. State*, 881 S.W.2d 702, 708 (Tex.Crim.App.1994). The relevant language in *Emery* states:

> The reviewing court must consider four factors: the length of the delay, the reasons for the delay, whether the defendant asserted his speedy trial rights, and any resulting prejudice to the defendant.

This language does nothing more than reiterate the test set out in *Barker*. The court's statement that this test is to be applied by "the reviewing court" provides some subtle indication that a *de novo* analysis is necessary for the application of the legal test stated in *Barker*. However, in order to apply the *Barker* test, first the facts must be established. We do not agree that there should be no review of the underlying factual determinations, or that review of the under-

lying factual determinations should be conducted without deference to the trial court.

The majority opinion in *Holmes v. State* said in a footnote "we agree in principle ... that we should review the trial court's decision[7] rather than making a *de novo* review because this is a fact-driven question." *Holmes v. State*, 938 S.W.2d 488, 490 n. 1 (Tex.App.—Texarkana 1996, no pet.)  But the court goes on to say that it feels compelled by *Emery* to conduct *de novo* review, despite its feeling that fact issues deserve deferential review. *Id.* We think the solution to the dilemma faced by the Texarkana court is to conduct deferential review of the underlying facts, and *de novo* review of the application of the *Barker* test to those facts.

We also consider the application of an abuse of discretion review only to be inadequate. For example, in *State v. Empak Inc.*, the First Court of Appeals in Houston said "a court deciding speedy trial issues reviews with deference the trial court's determination that the government was negligent in pursuing the accused." *State v. Empak, Inc.*, 889 S.W.2d 618, 623 (Tex.App.—Houston [14th Dist.] 1994, pet. ref'd) *citing Doggett v. United States*, 505 U.S. 647, 652–64, 112 S.Ct. 2686, 2691, 120 L.Ed.2d 520 (1992). The Houston court concludes "we cannot say the trial court abused its discretion in this case by finding that Empak's speedy trial right was violated." *Empak*, 889 S.W.2d at 625. In *Doggett* the U.S. Supreme Court called for deferential review of the trial court's determination that the government was negligent in bringing the accused to trial. *Doggett* at 652–54, 112 S.Ct. at 2691. However, deference is appropriate on that issue because it is

---

**5.** *Higbie* was overruled on grounds unrelated to this opinion in *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990). *Higbie* had said that a sobriety roadblock was unconstitutional in all cases because there was no individualized suspicion as required under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The Court in *Sitz* reversed this holding.

**6.** Unfortunately, *Higbie* contains some inexact language that muddies the water on these kinds of issues. *The court says that if the probable cause analysis were "solely a question of fact, ... then we, as well as the Courts of Appeals, would be bound by the findings of the trier of fact."*

Read literally, this language would mean that Texas appellate courts lack the power to review findings of the trier of fact in criminal cases. Yet it is well settled that "courts of appeals are vested with the authority to review fact questions in criminal cases." *See, e.g., Clewis v. State*, 922 S.W.2d 126, 129 (Tex.Crim.App.1996).

**7.** We assume they mean to say "review the trial court's decision with appropriate deference." This language should not be read to mean that the appellate court will not review a trial court's decision unless it is on a factual question—such a holding would preclude the *de novo* review of the *Barker* analysis that the Texarkana court ultimately conducts.

a factual question (*i.e.*, "what is the reason for the delay?"). We do not think it is correct to read *Doggett* as prescribing deferential review for the legal component of speedy trial analysis. This would establish different standards of review for Fourth Amendment claims [8] and speedy trial claims, and run contrary to the general principle that questions of law are reviewed *de novo*. *See, e.g., Cantu v. State,* 930 S.W.2d 594, 603 (Tex.Crim.App.1996).

Finally, we note that deferential review of the legal, constitutional standard could result in cases with identical facts leading to opposite results on issues of constitutional rights. As the U.S. Supreme Court noted in *Ornelas v. U.S* when explaining its decision to conduct *de novo* review in Fourth Amendment cases:

> A policy of sweeping deference would permit, "[i]n the absence of any significant difference in the facts," "the Fourth Amendment's incidence [to] tur[n] on whether different trial judges draw general conclusions that the facts are sufficient or insufficient to constitute probable cause." *Brinegar* [v. *United States,* 338 U.S. 160, 171] 69 S.Ct. 1302, 1308, [93 L.Ed. 1879] (1879). Such varied results would be inconsistent with the idea of a unified system of law. This, if a matter-of-course, would be unacceptable.

*Ornelas v. U.S.,* — U.S. —, —, 116 S.Ct. 1657, 1662, 134 L.Ed.2d 911 (1996). The *Ornelas* court added that legal rules "acquire content only through application." *Id.* While we consider the *Ornelass* opinion to be further support for applying a *de novo* standard to the trial court's application of the *Barker* test, we do not read this language as prohibiting deferential review of the underlying fact findings. If the "different trial judges" in the hypothetical situation described by the *Ornelas* court arrived at different fact findings, then the premise of an "absence of any significant difference in the facts" is removed, as is the danger of "unacceptable inconsistencies."

8. See *Thompson v. Keohane,* 516 U.S. 99, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995), discussed

Although no formal "findings of fact" were made in this case, the trial court did write a letter to the parties expressing the court's view of the facts of the case. Therefore, to the extent appellant challenges the findings expressed in the court's letter, we will only disturb these determinations if we consider them representative of an abuse of discretion. The bulk of appellant's complaints deal with the trial court's application of the *Barker* test to the facts of this case. We review those challenges *de novo*.

### Length Of The Delay

■ The facts underlying the "length of delay" prong are undisputed. We therefore review the trial court application of the law to those facts *de novo*. The delay in commencement of the trial must be of sufficient length to be presumptively prejudicial before a review of the remaining three factors is triggered. *Barker,* 407 U.S. at 530–31, 92 S.Ct. at 2192. The length of delay is measured from the time of arrest or formal accusation. *United States v. Marion,* 404 U.S. 307, 311–21, 92 S.Ct. 455, 459–63, 30 L.Ed.2d 468 (1971); *Harris,* 827 S.W.2d at 956. Most delays of eight months or longer are considered presumptively unreasonable and prejudicial. *Doggett v. United States,* 505 U.S. 647, 652 n. 1, 112 S.Ct. 2686, 2691 n. 1, 120 L.Ed.2d 520; *Knox v. State,* 934 S.W.2d 678, 681 (Tex.Crim.App.1996). In this case, Flores was arrested on December 21, 1991, but was not indicted until December 13, 1995. We consider a delay of approximately four years between arrest and indictment to be presumptively prejudicial.

### Reason For The Delay

The State does not dispute the facts underlying the delay in bringing this case to trial. Rather, the State argues that the trial court failed to give the proper weight to various considerations relating to the reason for the delay. We review these arguments using a *de novo* standard.

■ The State has the initial burden of justifying a lengthy delay. *Emery v.*

*supra.*

*State,* 881 S.W.2d 702, 708 (Tex.Crim.App. 1994). In light of a silent record or one containing reasons insufficient to excuse the delay it must be presumed that no valid reason for delay existed. *Turner v. State,* 545 S.W.2d 133, 137–38 (Tex.Crim.App.1976). In examining the reasons for the delay, different weights should be assigned to different reasons. *Barker,* 407 U.S. at 530–31, 92 S.Ct. at 2192. A deliberate attempt to delay the trial in order to hamper the defense should be weighed heavily against the State. *Id.* A more neutral reason such as negligence or overcrowded courts should be weighed less heavily, but nevertheless should be considered because the ultimate responsibility for such circumstances must rest with the State rather than with the defendant. *Id.* The State's negligence, however innocent, militates against the State. *Pierce v. State,* 921 S.W.2d 291, 294 (Tex.App.—Corpus Christi 1996, no pet.); *Empak,* 889 S.W.2d at 624; *Branscum v. State,* 750 S.W.2d 892, 895 (Tex.App.—Amarillo 1988, no pet.).

The delay in bringing this case apparently resulted from administrative mistakes that were made in the district attorney's office. The only witness to testify on this subject at the hearing on Flores's motion was John Olson, an attorney in the criminal law division of the Cameron County district attorney's office.[9] All Olson could say was that the file for the criminal case against Flores was sent to the district attorney's civil law section in June 1992, where it apparently remained until late 1995. He speculated that the civil law section may have needed the file for action on a civil case, but he did not show evidence of any action taken on the case by attorneys in either the civil or criminal sections prior to 1995. Olson's testimony suggests that the reason for the delay was negligence on the part of the district attorney's office, which, although not weighed as heavily as deliberate delay designed to prejudice the defendant, nevertheless militates against the

State and does not provide an acceptable excuse for the delay.

The State argues that the complex nature of the case should be considered as helping explain the delay. *See Barker,* 407 U.S. at 530–31, 92 S.Ct. at 2192. However, the complexity of the case played no part in the State's failure to bring this case to trial. Rather, the State apparently misplaced the case file and then did not notice the mistake for more than three years. This factor weighs in favor of Flores.

## Defendant's Assertion Of His Speedy Trial Right

Here also, the State does not dispute the facts Flores pointed to as evidence that he had diligently asserted his speedy trial right, nor does the State argue that the trial court misinterpreted this evidence and thereby arrived at unsupported factual determinations. Rather, the State argues that the facts of this case do not indicate an adequate assertion of the speedy trial right. We review this challenge *de novo.*

▮▮▮ A criminal defendant cannot be expected to demand a trial before he is charged. *Empak,* 889 S.W.2d at 624. The failure of a criminal defendant to demand a trial does not permit a presumption of waiver of the speedy trial right, since waiver of fundamental rights under the constitution may not be presumed from inaction. *Barker,* 407 U.S. at 524–26, 92 S.Ct. at 2189. Nevertheless, an appellant's lack of a timely demand for a speedy trial indicates strongly that he did not really want a speedy trial. *Harris,* 827 S.W.2d at 957.

On cross-examination of Bert Valdez, Flores's bail bondsman, the State emphasized the fact that Flores continued to pay $2000 each year from 1991 to 1995 to renew his bail. Flores had asked Valdez when his case would come to trial, and Valdez an-

---

9. The State argued that an explanation was included in an appendix attached to the State's supplemental response to Flores's motion. The appendix included handwritten notes about the case, apparently written by someone at the district attorney's office, which state "If the grand jury is curious as to why this file is so old, it is due to a civil suit that was filed against the

county prior to receiving the criminal file. The criminal file was inadvertently pulled and placed with the civil file the day it was brought to this office. It remained with the civil file until a month or so ago." If these comments are to be considered probative, they indicate negligence on the part of the State.

swered "I don't know. That's up to the courts to decide." Flores testified that he sought the advice of two lawyers while waiting for his trial. First, he went to Juan Magallanes, "to see if there was something else I could do," and Magallanes advised him "to sit back."[10] Later, in 1993, Flores asked attorney Ernesto Gonzalez to see if a case against him was pending, explaining that he told Gonzalez that "it had to be, you know, because I kept paying Bert every year to be on bail." Gonzalez testified that he spoke with a secretary at the district attorney's office, who told him that there was no case pending against Flores for involuntary manslaughter or driving while intoxicated. Gonzalez testified that he inquired about Flores's case at the district attorney's office again in 1995. Flores's sister, Elaine Flores, testified that she called the district attorney's office twice to inquire about possible charges against her brother. The first time she spoke to Norma Warner, who told her that she would check into the matter and advise her of the status of the case. A couple of weeks later, after not hearing from Warner, Flores called back and asked to speak with Warner. Flores was told that Warner was out of the office and would return her call. Flores testified that Warner never did return her call.

■ These actions indicate that Flores was interested in a speedy resolution of his case, if in fact charges were going to be brought against him. The State notes that Flores himself sought a continuance on the hearing on his motion to dismiss, and argues that this request shows that Flores was not interested in a speedy trial. Flores requested the continuance because his attor-

ney anticipated a conflict between Flores's trial date and other litigation the attorney was involved in.[11] While it is true that a failure by the defendant to object to the State's request for a continuance weighs against him, *see Barker,* 407 U.S. at 533–38, 92 S.Ct. at 2194–95, we do not believe that a criminal defendant must choose between prejudicing his speedy trial right or foregoing a continuance the defendant may need due to scheduling conflicts.

The State notes that Flores failed to inquire into his case during 1994, and argues that a failure to persistently assert the speedy trial right weighs against the defendant, citing *Ramirez v. State,* 897 S.W.2d 428, 433 (Tex.App.—El Paso 1995, no pet.). However, this case differs from *Ramirez* in significant ways. In *Ramirez,* the defendant's case had been re-set for trial twice before the defendant asserted his speedy trial right. *Id.* at 431. In this case, Flores and his sister inquired about his case several times, even though Flores had no burden to do so since no charges had yet been brought against him.

The State also argues that Flores's action in asking for dismissal in his first motion rather than first moving for a speedy trial weighs against him, citing *Pierce,* 921 S.W.2d at 295. We do not agree that *Pierce* supports the State's position. The defendant in *Pierce* moved for dismissal without first moving for a speedy trial, as did Flores, yet we nevertheless held in *Pierce* that the factor concerning the defendant's assertion of his right to a speedy trial weighed in the defendant's favor. *Id.*

We conclude that this factor also weighs in favor of the defendant.

10. The record does not indicate when Flores consulted Magallanes, except that Flores did testify that he consulted Magallanes prior to seeking the assistance of Ernesto Gonzalez in 1993.

11. The State argues that these conflicts were cleared up before Flores's trial date, and refers us "Transcript at 27, fn./2/." Footnote two on page twenty-seven of the transcript is from the State's supplemental response to Flores's motion to dismiss. The footnote alleges that Gonzalez obtained continuances in the two conflicting cases, and refers to "Appendix C." The page in the transcript labeled "Appendix C" is blank. The next page, which is unlabeled, contains the

handwritten notes referred to in footnote seven of this opinion, and other similar handwritten notes. These notes do not refer in any way to continuances or the other cases being handled by Gonzalez. We have reviewed all of the State's response in the transcript and can find no support for the claim that continuances were obtained in the two conflicting cases. Although the response did contain a copy of the docket sheet from one of the two cases, the docket sheet did not indicate that a continuance had been requested or granted. We consider this argument to be unsupported by the record.

## Prejudice Resulting from the Delay

Prejudice should be assessed in the light of the following interests which the speedy trial right was intended to protect: (i) preventing oppressive pretrial incarceration, (ii) minimizing anxiety and concern of the accused, and (iii) limiting the possibility that the defense will be impaired. *Barker*, 407 U.S. at 532–33, 92 S.Ct. at 2193. Excessive delay compromises the reliability of a trial in a way that neither party can prove, or, for that matter, identify. *Doggett*, 505 U.S. at 655–57, 112 S.Ct. at 2693. When a delay is caused by official negligence, the weight given to the resulting presumption of evidentiary prejudice grows over time, such that our tolerance of such negligence varies inversely with its protractedness. *Id.* When proof of specific prejudice is absent, presumptive prejudice arising from the unreasonable length of the delay, may, in combination with the other *Barker* factors, carry a defendant's Sixth Amendment claim. *Id.*

The State does dispute one factual determination of the trial court regarding the prejudice resulting to Flores from the delay. We will review this challenge under an abuse of discretion standard. The trial court wrote "[p]rejudice has been shown since a witness is unavailable and many of the facts about the incident have been forgotten to some extent by the [d]efendant." It is clear from the trial court's letter that the unavailable witness the court refers to is Dennis Gray, an investigator who conducted an initial investigation of the incident for the Harlingen police. The State argues that Flores failed to show adequate facts to establish that Dennis Gray was "unavailable" for purposes of establishing prejudice under the *Barker* analysis.

When unavailability of a witnesses is the basis of the alleged prejudice, an appellant must show that the witnesses were unavailable at the time he was tried, that their testimony may be relevant and material to his defense, and that due diligence was exercised in an attempt to locate such witnesses at the time he was tried. *McCarty v. State*, 498 S.W.2d 212 (Tex.Crim.App.1973); *Burgett v. State*, 865 S.W.2d 594, 598 (Tex.App.— Fort Worth 1993, pet. ref'd). Flores made no showing of "due diligence" in an effort to locate Gray. Rather, the State indicated in a letter to the court that after "less than five minutes" of effort it had located Gray and obtained his telephone number. We conclude that the trial court abused its discretion in determining that Gray was unavailable. We will proceed to examine the legal component of the prejudice prong without considering Gray as unavailable for purposes of bolstering Flores's prejudice claims.

The State acknowledges that the burden Flores bore in renewing his bond by paying $2000 each year does establish some prejudice against him. However, the State argues that minimal weight should be assigned to this form of prejudice, and argues that Flores is unable to show any other sort of prejudice.

Flores was released on bail shortly after his arrest, so he cannot argue excessive incarceration. Flores's sister did testify that her brother had been suffering emotionally during recent years, and that his anxiety was regarding the outcome of his trial. However, it appears from her testimony on cross-examination that at least some of his emotional suffering was due not just to anxiety from waiting for resolution of the possible case against him, but also from the car accident he allegedly caused.[12]

12. On cross examination, Elaine Flores testified:
> *State:* ... Considering the type of offense he is being charged with and considering for instance the collision he was in and then later finding out another person was dead, would you not be concerned if he didn't behave in the way that he did when you were having these very commendable and personal conversations with him?
> *Witness:* Yes, I would have been surprised, but then, on the other hand, I have known people that would just—it was an accident and it happened. But that was not his attitude at all.
> *State:* But as far as you would say, that would be an abnormal reaction in terms of it was an accident and it happened?
> *Witness:* Uh-huh.
> *State:* It would be something that you wouldn't expect?
> *Witness:* Right.
> *State:* But yet you were getting a reaction from your half brother here, considering the circum-

We next consider whether Flores's defense was impaired by the delay. The United States Supreme Court has noted that "impairment of one's defense is the most difficult form of speedy trial prejudice to prove, because time's erosion of exculpatory evidence and testimony 'can rarely be shown.'" *Doggett*, 505 U.S. at 655, 112 S.Ct. at 2692–93, *quoting Barker*, 407 U.S. at 532–33, 92 S.Ct. at 2193. Flores testified that he did not remember various details concerning the accident and his subsequent arrest. He did not remember who was present at the club where he had been before the accident. If these people could be produced, they might have been able to testify as to whether he was intoxicated. Flores also did not remember who was present at the accident scene. He did not remember whether the arresting officers conducted a fifteen minute observation prior to administering a breath test. However, on cross-examination, Flores conceded that intoxication could also impede one's memory. The State alleged that Flores was intoxicated, so it is unclear to what degree intoxication may have been responsible for his failing memory, and to what degree his inability to remember was due only to the passage of time.

The trial court found that "many of the facts about the incident may have been forgotten by the defendant to some extent." We believe that this finding was supported by adequate evidence and does not present an abuse of discretion by the trial court. Of course, it should be noted that the court qualifies its finding with two weakening modifiers, stating that the defendant "may" have forgotten "to some extent." We conclude that, although Flores failed to make a strong showing of impairment to his defense resulting from the delay in his trial, the burden of paying $2000 each year to renew

his bond should not be dismissed as insignificant and does establish some prejudice. In light of this prejudice, the inherent difficulty of proving impairment of one's defense, the presumption of prejudice arising from the four year lapse in bringing Flores to trial, and the weighing of the other *Barker* factors in Flores's favor, we conclude that the trial court was correct in ruling that Flores's speedy trial right was violated.

We overrule appellant's point of error and AFFIRM the judgment of the trial court.

stances, that another person lost his life, that was expectable?
*Witness:* Yes, it was. As a matter of fact, he would comment that he wished it would have been him instead.
*State:* That would be something you would hear other persons say as well, with some exceptions?
*Witness:* With some exceptions, yes.
*State:* So this was just a normal reaction from this individual with respect to a very traumatic accident?

*Witness:* Knowing my brother the way I do, no, because it has really affected him a lot more than that. It has affected his relationships with his family. It has affected his social life. It has affected his work for a while. And even with me, he really didn't want to talk about it anymore. He just kind of became— He almost became—He just withdrew from society for a while. . . .